All right, we'll recess until nine o'clock. Oh, she's still here. OK. It's all right. Get out while you can. Oh, you're still here. Yeah. Oh, where is she? There she is. Well, you come all the way from Washington. I have. I'll be with you tomorrow as well. Which matters is we put this. This is the first one. Yeah, we put it towards the end because we wanted to. We wanted. Yes, it's that we wanted Moussaelian to. Who was late to listen to the argument about what happens when you're late. But he apparently wasn't interested in learning about that. So he did send us a note. Did you see this? Sorry. Says your clerk has been advised that the court is not in the seat of my motion to submit the matter for decision. Based on the brief, since the matter set for hearing today, I request you inform the court I will not be able to appear due to a conflict and wish the court to decide the matter based on the brief of that oral argument. I sincerely apologize for not verifying the court was in receipt of my motion and for any inconvenience this may have caused. But I think we did have his motion. We denied it, didn't we? I'm not sure I saw that motion. We denied the motion for the other lawyer who already appeared in the earlier case. The other lawyer. Well, we didn't hear. Okay. Did you did you receive such a motion? Well, why can't we hear her argument? He just didn't show up. Yeah. I just didn't hear from you. Yeah. He didn't show up. Yeah. And I'll keep my remarks brief, Your Honor. My name is Julia Doig. I'm appearing on behalf of the Respondent in this case. And we're going to have the pleasure of hearing from you tomorrow as well. Yes, we will. Okay. To succeed on his due process claim of incompetent translation, Fitzgerald has to show error and that he was prejudiced as a result of that error. Specifically, he has to show that the outcome in his case would have been different. On this record, he has not and cannot make those showings. It's interesting to note that the translation issue was never raised before the immigration court and was not raised in the notice of appeal. It appeared for the first time in the appellate brief filed by petitioner's counsel to the board. In fact, in front of the immigration court, because there was no contemporaneous objection to any form of improper translation, you'll see clearly in the record that the immigration judge took explicit pains to make sure that the translation and that the translator provided was a competent translator and who was interpreting in a language that the alien could understand. There seemed to be some tension there in the transcript as to the actual translation. Well, not to the extent that the petitioner argues in his brief, Your Honor. There were three substantive hearings in the case. There were several other continuances for illness of the alien. But on all three occasions of the substantive hearings, the immigration judge inquired of the alien himself, what was his best language and whether he understood and could communicate with the interpreter. And on all three occasions, he said that, yes, he did speak Armenian the best. Now, this is a multilingual petitioner. He speaks apparently Russian, Armenian, some Georgian, and perhaps a little bit of English. But it's important for the judge to make sure, and he did so in this case on all the occasions, that the interpreter provided is in the language that the alien understands best and can best communicate in. There were two occasions where there was a question raised regarding an interpretation issue. In the first occasion, in the second merits hearing, which was the cross-examination and redirect of the alien, the interpreter did not understand the word that the alien used. And the English translation came out to be the word hooligan, which is perhaps not most commonly used. And I submit that probably some English-speaking people would not understand what is meant by hooligan. That was clarified on the record. No objections are made, and the case proceeded. The second time an issue came up was later in that same hearing, towards the end of the cross-examination, where the alien apparently used a Russian term in his explanation. The interpreter noted that he used a Russian term, and then the judge, again, repeated his questioning. Do you understand, how many languages do you speak? And the alien responded. And then the judge said, reminded him that the Armenian interpreter was provided, made sure that he understood Armenian, and reminded him to speak in Armenian. It's not uncommon for multilingual people to go back and forth, so I don't think that there was any problem there. The petitioner's counsel raised no objection to the quality of the interpretation or to the fact that this Armenian interpreter was ever used. Now, I recollect that we had two different attorneys representing him, and these two very widely separated, sort of the direct and then the cross. In the second time around, I think I recollect in the transcript, there was some notation toward the end that the attorney spoke Armenian. That's correct, Your Honor. In fact, the attorney was asking questions prior to complete interpretation of the answer. And the judge reminded the attorney also to. So if there are translation problems in the second part of the hearing, the attorney would have been picking them up. That's correct. And then there were no objections at all made to the quality of the interpretation. The objections in the brief to the board and continuing to this court are that the. You know, I've got a different question here. This gentleman is now either 83 or 84 years old. That's correct. Why are we doing this? Well, the law requires that he prove a valid asylum claim under the standards provided in order to succeed and be permitted to remain in the United States. Whether the Department of Homeland Security would decide as a matter of its inherent discretion not to remove this particular alien is a matter of prosecutorial discretion that it's not before this court. Well, but why was there wasn't there? What was the period? There was a 20 months after his direct that the cross-examination took place. Why did that happen?  Probably is attributable to the caseload of that court here in Los Angeles, but not explained in the record. It does seem like a long time. Again, no contemporaneous objections ever to that length of time. Or even on appeal, there was no objection to the length of time. It really only enters into the benefit of the alien who is allowed to remain in the United States longer. And he hasn't raised that as an issue, so. I gather he has a citizen daughter who lives here in, I think, in Glendale. Correct. And the record is clear that she has not petitioned for him to stay, at least as of the time of the transcript here. Does that remain true? I'm not aware of any petition that filed by the daughter to the state. I mean, there's a lot of, in that second time around, there's a lot of confusion when you read it, isn't there? There is some confusion. It says, sir, before coming to the United States, did you always live in Georgia? Yes. It would happen that I would go elsewhere for a month or two. OK. I have lived in Stalingrad. When did you live there? Stalingrad, I lived from 1962 until 1970. I was invited to and worked there. Sir, didn't you live in Stalingrad between 82 and 92? No, I didn't live there. Are you certain? I didn't live in Leningrad, in Stalingrad, in Stalingrad from 60 to 70. And then he was asked this question. This is all on cross-examination. Did they charge you with a crime? Yes, of course. What crime? When I told them the story, I said something about the story about the dog thing. And I said, why didn't you bring the other people involved? They said, this is none of your business. You just speak for yourself. Sir, my question is, what crime are you charged with? Answer. They wouldn't say to me exactly why. They would say to me, you are an Armenian. We speak to you in Armenian so that something like this doesn't happen to you. You see that the people don't like you. That's it. You get a lot of unresponsive answers here. But there's no direct tie between the unresponsiveness of the alien witness and the incompetent translation, which is the point that he, the only issue that he's raising before this court. Interestingly, he seems to have waived the merits of the asylum claim and raises only this due process claim. But there is no tie between his unresponsiveness to those questions. And again, his Armenian speaking. Well, maybe the translation was at fault. I believe that is Armenian. You said you used what? He had an Armenian speaking attorney. Yeah, but you know, it depends on where they get this Armenian. They speak different dialects and different ways of speaking in Armenian. It depends on where they come from. But the attorney seems to have understood enough to be able to ask a question prior to the full interpretation into the English at some point. Certainly, an Armenian speaking attorney would have objected. Well, that doesn't mean he, you know, he's such a great lawyer, he doesn't even show up in court, you know. I believe that was a different attorney. Well, anyway, we don't know how competent the Armenian speaking attorney was. Well, there's no claim of incompetent attorney or effective assistance here. It appears to me, given my experience with immigration law, that this alien received very good representation. He received very good interpretation at his hearing. His problem is that his asylum claims based on conditions of general civil strife and not issues related to a cognizable ground for asylum under United States immigration law. Didn't they say that he was beaten up? He, yes. Went to jail? Briefly. Yeah. How long was he there? I believe it was a matter of a couple of days. That's a long time. Could be, but again, I believe that I don't see an asylum claim here. I don't see an incompetent translation claim. I've seen thousands of cases. If I in any way believe that there wasn't a problem with due process here, it would be, I think, my duty to send this case back and ask this court to do that. But I frankly don't see the point in this case. The alien is elderly. His entire family is in the United States. He clearly wants to remain, and I don't begrudge him that desire. Well, here's another question asked. And sir, were there any other incidents that happened in Georgia? Answer. What would I say? I would not go out to the city a lot. I wasn't working. If I am amongst them all the time, my friends, the Georgian people, they weren't talking to me. No one was speaking to me. There's just a lot of confusion when you read this. I agree. In my mind, yeah. I agree that there's some confusion, but I don't believe that was related to incompetent translation. And I don't think the record shows that it was in any way related to incompetent translation. It may have been related to confusion on the alien's part, the desire of the alien to say the things and answer certain questions that weren't asked. But I don't think that there's any tie to incompetent translation here. And as such, he can't make out a due process claim. He can't succeed in this lawsuit. But you don't think there were any communication problems between the interpreter and the defendant? I don't believe so. There were only those two issues that I raised and which he raised in his brief, the issue with the hooliganism and the second issue with the use of a Russian word the alien returned to using Armenian language. And the hearing continued from there. But I don't think in any way that his non-responsiveness can be attributed to incompetent translation. Well, wasn't he beaten up once in the bread line? He may have been, but those issues aren't before the court on this case because he's limited his argument only to the translation and the due process issue and not to the merits of the asylum claim. Well, you're right about that. OK. Anything else? No, I'm done. Thank you, Your Honor. Thank you. See you tomorrow. Thank you for your time. I will recess until 9 AM tomorrow morning. All rise for the second round of hearings. These are all my law clerks right to the right of you. And these other folks here are law clerks. So you're a law professor, Michael.
judges: Pregerson, Cowen , W. Fletcher